UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 1:24-cr-226-5 (BAH) |
| : | |
| VAN ROBINSON, : | |
|    a.k.a. "BOOGIE" : | |
| : | |
| **Defendant.** : | |

**UNITED STATES' MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing as to Defendant Van Robinson (hereinafter, the "Defendant").[1] On March 19, 2025, the Defendant pled guilty to a Superseding Information [ECF No. 178], charging him with: 1) Conspiracy to Distribute and Possess with Intent to Distribute Fentanyl and Cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846 (Count One); and 2) Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Two).

For the reasons set forth below, the United States respectfully requests that the Court impose a sentence of 101 months of incarceration, to be followed by five years (60 months) of supervised release.

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

As the Court is aware, the Defendant's guilty plea is the result of his deliberate participation in a violent, armed group of drug dealers known as the "21st and Vietnam" crew. Members of the crew, some of whom identify the area they frequent as the "I Block," operated in a residential area in Northeast Washington, D.C., specifically the area colloquially known as "21st and Maryland."

---

[1] Sentencing is scheduled for November 21, 2025.

This refers to the area surrounding the intersection of 21st Street and Maryland Avenue NE, Washington, D.C., which consists mainly of low-rise apartments and row homes, and includes the 1900 block of I Street NE, Washington, D.C. (I Street NE is one block south of and parallel to Maryland Avenue NE. 19th Street NE is the next street to the west of and parallel to 21st Street NE.) In addition to being home to many D.C. residents, the area is also home to schools, playgrounds, recreational centers, and multiple businesses.

Within this D.C neighborhood alone, this crew has been responsible for the distribution of significant quantities of multiple types of narcotics, including crack cocaine, fentanyl, methamphetamine, phencyclidine ("PCP"), and n-n-dimethylpentylone ("boot"). Moreover, in a disturbing illustration of the link between drug trafficking and violence, 21st and Vietnam crew members have also been involved in multiple instances of firearms possession and shootings. These instances include two shootings charged in connection with this case: the March 7, 2024, incident in which co-defendant Charles Manson opened fire on a passerby walking his dog near the crew's open-air drug market (an event for which the Defendant was present); and the April 19, 2024 drive-by shooting, committed by co-defendants Briyon Shuford and Trevon Palmer, which wounded four people and terrorized others.

Although they certainly did not constrain their drug activities and violence to one exclusive area, the crew members, including the Defendant, frequently used an apartment building, located at 1919 I Street NE, Washington, D.C., as a base of operations for their criminal conduct. Specifically, members of the crew built their open-air drug market around the apartment building and its surroundings, selling drugs outside in the front and the rear, as well as the in first-floor hallway of the apartment building. These sales occurred on a near daily basis between at least June 2023, when the investigation began, and May 2024, when they were arrested. Indeed, the

Defendant and other crew members were so emboldened by their perceived invincibility that when one of the apartments became vacant (Apartment 101), they did not hesitate to begin using it for their own nefarious purposes. And the Defendant was a key part of this drug trafficking crew that essentially staged a takeover of an apartment complex in which innocent civilians resided so that they could use it as a headquarters for their operation. Indeed, he was observed by law enforcement on a near daily basis in and around 1919 I Street NE during the course of the investigation, working with his co-conspirators to sell drugs.

The Defendant's involvement with firearms and narcotics is also borne out by the search warrant executed on May 15, 2024, when the Defendant was arrested at his residence in Washington, D.C. Inside the residence, law enforcement recovered the following: (1) a Glock 27 firearm, which was loaded; (2) approximately 14 grams of suspected fentanyl; and (7) drug trafficking paraphernalia (including empty pill capsules and a digital scale).

## II.    LEGAL STANDARD

Pursuant to 18 U.S.C. § 3553(a), the Court shall impose a sentence that is sufficient, but not greater than necessary, to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and to "provide the defendant with needed educational or vocational training." 18 U.S.C. § 3553(a)(2). In addition, the Court must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant;" the types of sentences available, the Sentencing Guidelines; any pertinent policy statements; the need to avoid unwarranted sentence disparities; and the need to provide restitution to any victims. *Id.* § 3553(a).

The listed factors in 18 U.S.C. § 3553(a) include the following:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;

2) The need for the sentence imposed –
   a) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   b) To afford adequate deterrence to criminal conduct;
   c) To protect the public from further crimes of the defendant; and
   d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3) The kinds of sentences available;

4) The kinds of sentence and the sentencing range established for –
   a) The applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
      i) Issued by the Sentencing Commission . . . ; and
      ii) That . . . are in effect on the date the defendant is sentenced

5) Any pertinent policy statement –
   a) Issued by the Sentencing Commission . . . and
   b) That . . . is in effect on the date the defendant is sentenced

6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7) The need to provide restitution to any victims of the offense.

Procedurally, after calculating the applicable Guidelines range, the Court should next consider all the applicable factors set forth in 18 U.S.C. § 3553(a). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007).

### III.    GUIDELINES CALCULATION

#### A.    Total Offense Level

With respect to Count One, the base offense level for a violation of 21 U.S.C. § 841(a)(1) is governed by U.S.S.G. §§ 2D1.1(a)(5) and (c)(8). As detailed in the Final Presentence Report

4

(the "PSR") [ECF No. 281] and the plea agreement [ECF No. 182], the base offense level for Count One is 24 because the Defendant is accountable for at least 100 KG but less than 400 KG of Converted Drug Weight. After adjustments for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a) and (b), the final offense level for Count One is 21.

As to Count Two, the applicable guidelines sentence for a violation of 18 U.S.C. § 924(c)(1)(A)(i) is governed by U.S.S.G. § 2K2.4(b). Pursuant to U.S.S.G. § 5C1.2, Chapters Three (Adjustments) and Four (Criminal History) do not apply.

### B. Criminal History Category

The PSR writer calculates the Defendant to have a total of three criminal history points, which places him in Criminal History Category II. *See* PSR ¶ 120.

### C. Sentencing Guideline Range

For Count One, a final offense level of 21 and Criminal History Category II results in a guidelines range of 41 to 51 months of incarceration, 3 years of supervised release, and a fine range of $15,000 to $1,000,000. *See* U.S.S.G. §§ 5D1.2(c)(3) and 5E1.2(c)(4). The guidelines range for Count Two is the minimum term of imprisonment set by statute, here, 60 months of incarceration, and 2 to 5 years of supervised release, pursuant to U.S.S.G. § 2K2.4(b). As a result, the Defendant's aggregate sentencing range, calculated by adding the ranges for Counts One and Two, is 101 to 111 months of incarceration.

## IV. ARGUMENT

As stated above, the United States respectfully requests that the Court sentence the Defendant to a term of 101 months of incarceration, followed by 60 months of supervised release. For the reasons detailed below, the United States respectfully submits that a sentence of 101 months is sufficient, but not greater than necessary, to serve the interests of justice and

appropriately balances the sentencing factors under 18 U.S.C. § 3553(a).

    1.    **The Nature, Circumstances, and Seriousness of the Offense**

This Court is aware of the damage caused by the Defendant and his co-conspirators, which extends well beyond the cost of addiction in terms of human suffering and societal harm. The actions of the Defendant and his co-conspirators destabilized and terrorized an entire apartment building, bringing damage to the neighborhood community and beyond. As the United States has previously noted, it is difficult to adequately assess the impact upon the residents of 1919 I Street NE or the entire neighborhood, who bore witness to their emboldened lawlessness, caused by the brazen actions of the Defendant and his co-conspirators, which involved the lethal combination of drugs and guns.

According to the DEA, fentanyl "is similar to morphine but about 100 times more potent [. . . .] Because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction [. . . .]" *See* DEA, Facts about Fentanyl, https://www.dea.gov/resources/facts-about-fentanyl. Startingly, "two milligrams of fentanyl can be lethal depending on a person's body size, tolerance and past usage." *Id.* The lethality of fentanyl is reflected in nationwide statistics: roughly 97,309 people in this country died of drug overdoses in the 12-month period ending in April 2024. *See* CDC National Center for Health Statistics, *Provisional Drug Overdose Death Counts* (based on provisional data available as of September 1, 2024).[2] Of these deaths, roughly 65,787 (or about 68 percent) involved synthetic opioids (of which fentanyl is one). *Id.* (By comparison, in 2022, 46,728 people in the United States died of firearms. *See* JHU Bloomberg School of Public Health, *Continuing Trends: Five Key Takeaways from 2023 CDC Provisional*

---

[2] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.

*Gun Violence Data* (September 12, 2024)).[3] And, thanks in part to people like the defendants in this case, our community has been pummeled by fentanyl: in 2022, Washington, D.C., had an opioid overdose death rate of 48.9 people per 100,000—third among all the states and D.C. only to West Virginia and Delaware. *See* KFF, *Opioid Overdose Death Rates and All Drug Overdose Death Rates per 100,000 Population (Age-Adjusted)* (2022 timeframe).[4]

      To be clear, the Defendant, unlike some of his co-conspirators, did not directly sell hundreds of grams of fentanyl to undercover officers. The investigation, however, uncovered evidence that he was, in fact, engaged in trafficking larger quantities. As depicted in Figures A and B below, on February 5, 2024, co-defendant Trevon Palmer texted the Defendant (a.k.a. "Boogie"), "you got something for me." In the continued text thread, they then appeared to discuss an "8th" for $2500. Although one cannot be certain exactly what substance was being discussed, this exchange and the reference to "2500$" is consistent with the price of 125 grams – or an 1/8 of a kilogram – of fentanyl. As also seen below, Palmer then sends the Defendant an image of a scale, covered in white residue, showing a digital weight of 125.1.

---

[3] https://publichealth.jhu.edu/center-for-gun-violence-solutions/2024/continuing-trends-five-key-takeaways-from-2023-cdc-provisional-gun-violence-data.

[4] https://www.kff.org/other/state-indicator/opioid-overdose-death-rates.










*Figure A: February 5, 2024 text exchange between defendant Robinson and Palmer*



*Figure B: extracted image of digital scale from text exchange depicted in Figure A*

Other evidence, including text messages between the Defendant and Palmer, similarly

9

support the extent of the Defendant's role in selling narcotics with his co-conspirators. In the below text exchange depicted in Figure C, Palmer appears to refer to narcotics, specifically "cappos" – believed to be capsules containing fentanyl, which were sold by members of the conspiracy, including the Defendant.



*Figure C: January 2024 text messages between Palmer and defendant Robinson*

Notably, the Defendant not only sold capsules containing fentanyl during controlled purchases conducted during the investigation, he was also seen on surveillance video outside of

1919 I St. NE *on multiple occasions* engaged in apparent hand to hand transactions in which he appears to be distributing similar capsules to suspected drug users. Moreover, the fentanyl capsules sold by the Defendant during the controlled purchases bear a striking resemblance to empty capsules – suspected narcotics packaging – which were recovered in bulk from his residence during the execution of the May 15, 2024, search warrant.

Nor can the recovery of a loaded firearm from the Defendant's residence be overlooked, in light of the extensive links between firearms possession and violence and this crew. To be clear, there is no evidence that the Defendant himself personally engaged in gun violence or even that he was willing to do so. Significantly, however, he was present for the March 7, 2024 verbal altercation between members of the crew and a passerby walking his dog, which ultimately sparked co-defendant Charles Manson's decision to open fire, in broad daylight and across a busy road. Put simply, the Defendant was not a peripheral figure in this conspiracy; rather, he was a trusted core member and an equal participant in the crew's activities.

2. **The Defendant's History and Characteristics**

The United States recognizes not only the Defendant's acceptance of responsibility but also the incredibly difficult circumstances of his life, as detailed in the PSR. *See* PSR ¶¶ 143-145. Nor does the United States overlook the Defendant's own history of drug addiction or that, notwithstanding these challenges, he has had periods of gainful employment. As reflected in the PSR, it appears he previously started and ran his own businesses, and he enjoys the benefit of a supportive, stable family and home environment.

What is troubling, however, is that despite experiencing the cost of addiction on his own upbringing, he then chose to inflict that very same harm on others. Moreover, he did so despite being, by all appearances, an otherwise successful member of the community, an entrepreneur,

and supportive father.  The Defendant is 44 years old – not a young kid, whose involvement in this crew resulted from a period of rash choices and poor influences.  Nor can it be said that his drug trafficking activity was limited in nature or simply to support his own habits.  On the contrary, the Defendant made the deliberate decision to participate in drug trafficking that effectively held an entire apartment building hostage, fed the addictions of many, and harmed countless others, all while departing that neighborhood at the end of each day to return to his own home and family – far removed from the impact of his criminal activity.

Although he has no prior convictions involving violent crimes, he has accumulated ten convictions and eighteen arrests through his life, which encompass a range of criminal conduct.  Notably, his 2005 conviction (D.C. Superior Court Case 2005 FEL 3443), although dated, involved drug trafficking near 21st and I Streets NE, the very same area involved in the instant case.  Despite multiple interactions with the judicial system, however, it appears the Defendant has not yet been deterred.  Nor does it appear that his arrest and the potential consequences in this case deterred him; as noted in the plea agreement and PSR, he was found in possession of approximately 5 grams of fentanyl while detained at the D.C. jail in this case.

In sum, it is clear that the Defendant has experienced challenges and difficulty in his life, and the United States is not unsympathetic.  Despite family support and opportunities for other gainful employ, however, he still chose to be a key member of a significant drug crew.

### 3.     The Need to Promote Respect for the Law and Deterrence

As called for by the statute, the sentence should reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and provide just punishment for the offense.  *See* 18 U.S.C. § 3553(a)(2).  The United States respectfully submits that the need to deter not only the Defendant, but also others, weighs in favor of the recommended sentence.  As the

United States has noted before, the need for deterrence is particularly significant here, where the Defendant's conduct (along with those of his co-conspirators) impacted many: the entire neighborhood they operated in, the residents of the apartment building they took over, and the drug users to whom they sold (as well as those users' families and friends).

In a case such as this, where the Defendant's actions were felt by many and visible to yet more, and where the Defendant has long been engaged in criminal activity in the very same area, a substantial prison sentence is the best measure of deterrence available to the Court, and the United States submits that a sentence of 101 months is appropriate. Such a sentence accomplishes the aims of § 3553(a)(2) in both a general and particularized manner. As applied to the Defendant, such a sentence reflects both the seriousness and dangerousness of the Defendant's conduct in this case. With respect to general deterrence, this recommended sentence promotes respect for the law and the safety of the community by serving as a deterrent to brazen conduct such as that perpetrated by the Defendant and his co-conspirators in this case, and it will help ensure that others are not similarly emboldened.

### 4.  Other factors

The United States' recommended sentence is also justified to protect the public from the Defendant, who carried out his conduct up until his arrest in this case, as reflected in the significant quantity of narcotics and the firearm recovered from his residence.

## V.     CONCLUSION

For the foregoing reasons, the United States recommends that the Court sentence the Defendant to 101 months of imprisonment, followed by 60 months of supervised release. Such a sentence serves the interest of justice and appropriately balances the sentencing factors articulated under 18 U.S.C. § 3553(a).

                                            Respectfully submitted,

                                            JEANINE FERRIS PIRRO
                                            UNITED STATES ATTORNEY

By:   */s/ Andrea Duvall*
       SOLOMON EPPEL
       DC Bar No. 1046323
       ANDREA DUVALL
       AR Bar No. 2013114
       Assistant United States Attorneys
       601 D Street, NW
       Washington, D.C. 20530